[Cite as *State v. Kudla*, 2016-Ohio-5215.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27652 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| GREGORY KUDLA | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014 05 1461 |

## DECISION AND JOURNAL ENTRY

Dated: August 3, 2016

MOORE, Judge.

{¶1} Defendant-Appellant, Gregory Kudla, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

### I.

{¶2} B.M.K. is the eldest of Mr. Kudla's four children. On May 13, 2014, B.M.K.'s younger sister, B.R.K., told school officials that her father had physically assaulted her the previous evening when she came home late from school. She also told school officials that she suspected her father was having a sexual relationship with her older sister. As a result of her accusations, the school involved the police, and the police brought the Kudla children to the police station for questioning. B.M.K. initially denied the accusations, but ultimately broke down and admitted that her father had sex with her. B.M.K., who was 18 years old at the time, eventually admitted that her father began touching her inappropriately when she was around 12

years of age and had been having vaginal intercourse with her since she was 14 years old. She also stated that, at times, her father had tried to show her pornographic videos on his computer.

{¶3}    A grand jury indicted Mr. Kudla on eight counts of rape, eight counts of sexual battery, five counts of gross sexual imposition, and one count of disseminating matter harmful to juveniles. The State dismissed one of the counts of gross sexual imposition before trial, so that count is not at issue in this appeal. The indictment alleged that Mr. Kudla raped B.M.K. twice each year from April 2010 through April 2014. The sexual battery counts mirrored the rape counts with two counts occurring each year during the four-year period. Meanwhile, the indictment alleged that, from April 2005 through April 2009, Mr. Kudla committed gross sexual imposition against B.M.K. once per year at a time when she was under 13 years of age. The indictment further alleged that he showed her obscene materials while she was a juvenile.

{¶4}    A jury ultimately heard this matter and found Mr. Kudla guilty on all 16 counts of rape and sexual battery. The jury also found him guilty of disseminating matter harmful to juveniles and of committing gross sexual imposition between April 2008 and April 2009. The jury returned not guilty verdicts on the three remaining counts of gross sexual imposition. The trial court determined that that the rape and sexual battery counts were allied offenses of similar import, so the State elected to have Mr. Kudla sentenced on the rape counts. The court sentenced Mr. Kudla to serve a total of 42½ years in prison.

{¶5}    Mr. Kudla now appeals and raises four assignments of error for our review. For ease of analysis, we rearrange several of his assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE
DEFINITION OF FORCE AS AN ELEMENT OF THE RAPE CHARGES[.]

{¶6} In his first assignment of error, Mr. Kudla argues that the trial court committed plain error when it instructed the jury on the force element of rape. Specifically, he argues that the court erred when it instructed the jury that evidence of subtle or psychological force rather than actual or threatened force would satisfy the force element of his rape charges. We disagree.

{¶7} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). If a defendant fails to object to the court's giving of an instruction or failure to give an instruction, he or she forfeits all but plain error on appeal. *See State v. Webb*, 9th Dist. Summit No. 27424, 2015-Ohio-2380, ¶ 26. Plain error will only be found if it affects a substantial right. Crim.R. 52(B). "There are three requirements to finding plain error." *State v. Proctor*, 9th Dist. Summit No. 26740, 2013-Ohio-4577, ¶ 4, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 15-16. "First, there must be an error." *Proctor* at ¶ 4, citing *Payne* at ¶ 16. "Second, the error must be obvious." *Proctor* at ¶ 4, citing *Payne* at ¶ 16. "Lastly, the error must have affected the outcome of the trial." *Proctor* at ¶ 4, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice." *Proctor* at ¶ 4, quoting *State v. Long*, 53 Ohio St.2d 91, 95 (1978).

{¶8} When instructing the jury on the force element of rape, the trial court instructed:

Force means any violence, compulsion or constraint physically exerted by * * * any means upon or against a person or thing.

When the relationship between the victim and the defendant is one of child and parent, the element of force need not be openly displayed or physically brutal. It can be subtle or slight and psychological or emotionally powerful.

Evidence of an express threat of harm or evidence of significant physical restraint is not required.

> If you find beyond a reasonable doubt that under the circumstances in evidence the victim's will was overcome by fear, or duress or intimidation the element of force has been proved.

Mr. Kudla argues that the court erred when instructing the jury that it could consider the parent-child relationship he had with B.M.K. in deciding whether the State had proven force. According to Mr. Kudla, the Ohio Supreme Court has only sanctioned an instruction on subtle or psychological force in instances where the minor victim is under the age of 13. *See State v. Dye*, 82 Ohio St.3d 323 (1998), syllabus. Because the rapes here were alleged to have occurred when B.M.K. was between 14 and 17 years of age, Mr. Kudla argues, the special instruction on force was in error. He argues that he was prejudiced by the instruction because there was no evidence that he used actual or threatened force to compel B.M.K. to submit to sexual conduct.

{¶9} In *State v. Eskridge*, 38 Ohio St.3d 56 (1988), the defendant appealed from a jury's determination that he used force or the threat of force to rape his four-year old daughter. The Supreme Court held that

> [t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.

*Eskridge* at paragraph one of the syllabus. The Court noted that the defendant had used "at least minimal force" against his four-year old daughter when he had removed her underwear and placed her on a bed. *Id.* at 58. The Court then looked to the age, size, and power disparity between the victim and the defendant to conclude that the State did not have to set forth evidence of any "explicit threats or displays of force." *Id.* at 59. The Court wrote that it "recognize[d] the coercion inherent in parental authority when a father sexually abuses his child." *Id.* at 58. In such instances, the Court wrote, "[f]orce need not be overt and physically brutal, but can be

subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.* at 58-59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154 (8th Dist.1985).

{¶10} Four years after *Eskridge*, the Supreme Court issued *State v. Schaim*, 65 Ohio St.3d 51 (1992). *Schaim* likewise involved a father who raped his daughter, but, unlike the victim in *Eskridge*, the victim in *Schaim* was 20 years old when the two rapes occurred. The victim in *Schaim* testified that her father began fondling her when she was ten or eleven and had oral sex with her in her mid-teens. *Schaim* at 52. When she was 20 years old, her father engaged in vaginal intercourse with her on two occasions. *Id.* The victim testified that she did not consent to the intercourse, but her father also did not employ force. *Id.* She stated that she felt from prior experience that her father would punish her if she did not submit to the rapes. *Id.*

{¶11} The Supreme Court distinguished the victim in *Schaim* from the victim in *Eskridge* on the basis of their respective ages. The Court wrote:

> No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. Although we are aware of the devastating effects of incest on its victims, and are sympathetic to the victim whose will to resist has been overcome by a prolonged pattern of abuse, we reluctantly conclude that a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2). A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her.

*Id.* at 55. The Court noted that there was no evidence that the defendant had threatened the victim with force or that he "had used physical force or threatened [her] with physical force in the past, such that she would infer the threat of physical force based on past occurrences." *Id.* It

further noted that the victim herself testified that the defendant "didn't force me[.]" *Id.* Because the State failed to produce any evidence of actual or threatened force, the Supreme Court affirmed the dismissal of the defendant's rape convictions. *Id.* at 56.

{¶12} Finally, in *State v. Dye*, the Supreme Court considered whether to apply *Eskridge's* holding when the perpetrator of a rape is not a minor's parent, but nonetheless holds a position of authority over the minor. *Dye*, 82 Ohio St.3d at 326. The victim in *Dye* was a nine-year old child who was raped by a close, adult friend of his mother's. The Court noted that the defendant was "an important figure of authority" in the victim's life and that the victim's mother had placed him in the defendant's care on numerous occasions while instructing the victim to mind him. *Id.* at 328. The Court examined the disparity between the victim and defendant in terms of age, size, and strength and noted that there was substantial evidence that the defendant had used psychological force against the victim. *Id.* at 328-329. In upholding the life sentence for the defendant's rape convictions, the Court ultimately held that "[a] person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint." *Id.* at syllabus.

{¶13} Contrary to Mr. Kudla's assertion, the Supreme Court has never held that an *Eskridge* instruction on force is only appropriate when a minor victim is under 13 years of age. The syllabus in *Dye* focused on children younger than 13 because the defendant in that case was charged with violating that particular portion of the rape statute. *See* R.C. 2907.02(A)(1)(b) (prohibiting sexual conduct when victim is less than 13 years old). *Eskridge* involved a victim under the age of 13, but specifically relied upon a case where the victim was 14 years old. *See Eskridge*, 38 Ohio St.3d at 59, citing *Fowler*, 27 Ohio App.3d at 154. The Supreme Court

favorably cited that case again in *Dye*. *See Dye* at 328, citing *Fowler* at 154. Moreover, this Court has previously applied *Eskridge* in cases where the victim was older than 12. *See State v. Roy*, 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, ¶ 37-39 (15-year old victim); *State v. Clay*, 9th Dist. Medina No. 04CA0033-M, 2005-Ohio-6, ¶ 7-18 (16-year old victim); *State v. Musgrave*, 9th Dist. Summit No. 18260, 1998 WL 831574, *3 (Dec. 3, 1998) (13-year old victims). Mr. Kudla has not attempted to distinguish this case from any of the foregoing cases. *See* App.R. 16(A)(7).

{¶14} Unlike the victim in *Schaim*, B.M.K. was not an adult when her father had sexual intercourse with her. The State set forth evidence that she was around 12 years of age when her father started touching her sexually and that she was around 14 years of age the first time he had intercourse with her. As detailed below, the State produced evidence that B.M.K. lived in her father's home without her mother, that he was controlling, and that, at times, he was physically abusive toward B.M.K.'s younger sister. There was testimony that he instructed B.M.K. not to tell others about their sexual relationship and that she was afraid of her father because she saw how he treated her younger sister when she disobeyed him. The case at hand, therefore, is distinguishable from *Schaim*.

{¶15} In *Clay*, this Court upheld a trial court's decision to instruct the jury in accordance with *Eskridge* where the victim was 16 years old. *Clay* at ¶ 4-18. There, the State produced evidence that the victim, while not a child of tender years, had not yet reached the age of majority, lived in the same house as the defendant, her step-father, and testified that she was afraid of him. *Id.* at ¶ 8. This Court wrote that, "[a]s an authority figure over the victim, [the defendant] was in a position to assert force by subtle and psychological means." *Id.* at ¶ 16. Because there was evidence that the victim was a minor, subject to her step-father's authority,

and afraid of him, we sanctioned the trial court's giving of the special force instruction from *Eskridge*. *Id.* at ¶ 16-18.

{¶16} The case at hand is analogous to *Clay*. B.M.K. was around the same age as the victim in *Clay* when her father had sexual intercourse with her. Indeed, she was two years younger than the victim in *Clay* when he took her downstairs, removed her clothes, and had sex with her for the first time. Much like the victim in *Clay*, B.M.K. lived in the same house as her father, and there was testimony that she was afraid of him. Much like the step-father in *Clay*, Mr. Kudla was an authority figure and "was in a position to assert force by subtle and psychological means." *Id.* at ¶ 16. Thus, this Court's precedent supports the trial court's decision to give an *Eskridge* instruction here. *See Clay* at ¶ 4-18. *See also Roy*, 2014-Ohio-5186, at ¶ 36-39. Mr. Kudla has not shown that the court erred when it instructed the jury on the force element of rape.

{¶17} As previously noted, an appellant who seeks to demonstrate plain error must, first and foremost, demonstrate that an error occurred. *See Proctor*, 2013-Ohio-4577, at ¶ 4, citing *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 16. Because Mr. Kudla has not shown that the trial court committed an error in its force instruction, he cannot demonstrate plain error. His first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE FINDINGS OF GUILT ON THE CHARGES OF RAPE[.]

{¶18} In his third assignment of error, Mr. Kudla argues that his rape convictions are based on insufficient evidence. Specifically, he argues that the State failed to establish that he used either actual or threatened force against B.M.K. to compel her to engage in sexual conduct with him. We disagree.

{¶19} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶20} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). Sexual conduct includes vaginal intercourse, oral sex, and "the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another." R.C. 2907.01(A). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person * * *." R.C. 2901.01(A)(1). Whoever commits the foregoing offense is guilty of rape. R.C. 2907.02(B).

{¶21} B.M.K. testified that she was born in April 1996. When she was between 8 and 15 years of age, B.M.K. resided in Macedonia with her father, her three younger siblings, and, initially, her mother. She testified that she did not have a close relationship with her mother, but was always very close with her father. B.M.K.'s mother, Jennifer Kudla, resided at the family's Macedonia home until B.M.K's freshman year of high school. Ms. Kudla then moved elsewhere, but came to the house in the mornings to help the children prepare for school. In March 2012, shortly before B.M.K. turned 16, B.M.K., her father, and her siblings moved to a new residence in Twinsburg. Meanwhile, Ms. Kudla continued to reside elsewhere.

{¶22} B.M.K. testified that, when she was a small child, she cuddled with her father and sat on his lap. She remembered that she was in sixth grade the first time that her father touched her sexually. B.M.K. recalled lying next to her father and watching television in the basement of their Macedonia home when he began caressing her genitals over her clothes. From that point forward, B.M.K. testified that her father would touch her more than once a month. She testified that he primarily touched her while the two were in the basement and that his touching gradually increased until he was placing his hands under her clothes and touching her vagina.

{¶23} B.M.K. testified that, as she got older, she became curious about the physical changes taking place in her body and started asking her father questions. In seventh or eighth grade, B.M.K. asked Mr. Kudla about sexual intercourse. According to B.M.K., her father then asked her if she wanted to know what happened during intercourse, and she said yes. She testified that her father took her downstairs on his birthday, removed his pants, removed her clothing, and had vaginal intercourse with her for the first time. B.M.K. stated that it hurt when her father penetrated her and she told him so. Mr. Kudla then told her that the pain "was normal and it was okay" and "took it slow." After she indicated that it hurt more, however, her father stopped.

{¶24} B.M.K. testified that, after her father had sex with her, he digitally penetrated her vagina and had oral sex with her several times while she and her family were still residing at their Macedonia residence. Additionally, her father asked her to perform fellatio on one occasion and purchased a vibrator for her. B.M.K. stated that her father instructed her to use the vibrator "if [she] ever felt like [she] needed to." She also stated that two or three times her father attempted to show her pornography on his computer. She described the pornography as "[o]ther people having sex," but stated that she would look away when her father tried to show it to her

because she did not want to watch. According to B.M.K., all of the foregoing acts occurred while her mother was still residing at the Macedonia home with them. She testified that, after her mother moved out, her father touched her more frequently.

{¶25} Once Mr. Kudla moved his family to Twinsburg, B.M.K. testified that he would have vaginal intercourse with her on an almost nightly basis. She testified that the two would always have sex in her father's bedroom with the door closed and locked while he played loud music on his computer. B.M.K. indicated that her younger sister's bedroom was diagonal to her father's bedroom, but that he would have sex with her at around 10 or 11 o'clock at night after her younger siblings had gone to bed. She testified that her father purchased two more vibrators for her after they moved to Twinsburg and that she would use them in his presence because "[h]e wanted me to cum." B.M.K. stated that her father digitally penetrated her vagina and had vaginal intercourse with her multiple times per year until she turned 18. She testified that her father told her not to tell anyone about their sexual relationship because "society doesn't rule you, and * * * they shouldn't be telling you what to do in your personal life."

{¶26} B.M.K. agreed that she was afraid of her father when he was angry because he would yell and "his face would get all red." She testified that her father and her younger sister, B.R.K., had a strained relationship and that things sometimes got physical when B.R.K. disobeyed him. B.M.K. saw her father throw her sister across the room and into a wall hard enough to make her start crying. She also saw him throw B.R.K. into the stairs. B.M.K. testified that she had sexual intercourse with her father because she "knew what would happen if [she] didn't." She stated that her father had threatened to take away her phone as well as the special privileges she enjoyed. She testified that she wanted the sexual activity to stop back when they lived in Macedonia and that she told her father it "wasn't normal," but that he continued to have

sex with her. She stated that her father never held her down or specifically threatened her, but that "[s]ometimes [the sexual conduct] was forced" because she "would tell him that [she] didn't want to do it."

{¶27} B.M.K. testified that she did not want to disclose her father's sexual abuse because she "didn't want [her] brothers to grow up without a father." She admitted that she still loved her father and had not wanted him to get into trouble. She testified that her mother suffered from mental health issues and that she had basically raised her younger siblings alongside her father. B.M.K. admitted that she hated her younger sister for disclosing the sexual abuse because she thought her sister had "ruined [their] family."

{¶28} B.R.K., B.M.K.'s younger sister, testified that her sister and their father were always very close and that Mr. Kudla favored B.M.K. She specified that her father would take B.M.K. places or buy her things, but that he would not do so for his other children. She described herself as having a contentious relationship with her father and testified that her father would always ground her, take away her things, and scream at her. She testified that, on one occasion when they still lived in Macedonia, her father pinned her down on the bed and fondled her chest while she screamed and B.M.K. watched. On a different occasion, her father threw her across the room and kicked her hard enough to leave a bruise. B.R.K. testified that, on the occasion that gave rise to her disclosure of her sister's abuse, her father kicked down the door to the bathroom where she was taking a shower, screamed at her, and slapped her across the face. According to B.R.K., she was afraid to tell anyone what things were like at home because her father "always said that he was above the law and no matter what [she] said it wouldn't have mattered." She also testified that B.M.K. "would never have said anything because she was terrified of [their father]."

{¶29} Dr. Cynthia Keck-McNulty, a mental health therapist/trauma specialist at Akron Children's Hospital, testified at trial regarding her treatment of B.M.K. and the grooming process that sexual predators use to perpetrate abuse. She explained that, when grooming a child, a predator will typically select a child with low self-esteem and begin providing them with special treatment. According to Dr. Keck-McNulty, that special treatment can come in the form of extra attention, special trips, gifts, or other treats. The perpetrator elevates the child and cultivates a special relationship with them before beginning to introduce a sexual element. Dr. Keck-McNulty testified that the perpetrator may begin by touching the child in increasing amounts or by showing the child inappropriate viewing materials such as pornography. She testified that the child may recognize that the new elements of the relationship are wrong, but will ultimately accept them because the child has become dependent upon the affection and attention that the predator has shown them. She further testified that the predator will stress secrecy with the child and "make[] it very well known to [the] child * * * that other people wouldn't understand" and that disclosing the abuse would result in the child getting into trouble and the loss of the special attention upon which the child has come to rely. According to Dr. Keck-McNulty, such abuse can go on for years before disclosure occurs because the children the predators select "have a low self-esteem and they don't get a lot of attention or positive stuff from other adults or other people and so they're not about to give that up."

{¶30} Dr. Keck-McNulty testified that Mr. Kudla's representation to B.M.K. that their relationship was special and that society should not interfere in one's personal affairs was consistent with grooming behavior. It was her impression that B.M.K. was torn between loving her father and feeling betrayed by his manipulation. She explained that Mr. Kudla had cultivated a very close relationship with B.M.K. and had given her special privileges, but otherwise kept

her on a very strict schedule. B.M.K. was responsible for caring for her younger siblings, overseeing the chores in the house, and doing the grocery shopping. B.M.K. told Dr. Keck-McNulty that Mr. Kudla would not allow her to cheerlead because boys would look at her and would not allow her to play volleyball because he did not permit spandex clothing. B.M.K. also told her that Mr. Kudla would not allow her to date and that, when she once tried to date a boy at the age of 15, "her dad put an end to that right away and she never tried again." Dr. Keck-McNulty testified that B.M.K. admitted that she was afraid of her father because she had seen what he could do to her younger sister.

{¶31} As noted, R.C. 2907.02(A)(2) requires the State to prove that an offender purposely compelled his or her victim to submit to sexual conduct "by force or threat of force." R.C. 2907.02(A)(2). Mr. Kudla argues that there was no evidence that he ever used actual force against B.M.K. or threatened her with force so that she would submit to sexual conduct. Yet, "[the] threat of force can be inferred from the circumstances surrounding sexual conduct * * *." *Schaim*, 65 Ohio St.3d at paragraph one of the syllabus. Further, "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *Eskridge*, 38 Ohio St.3d at syllabus. "[I]n the context of a parent-child relationship, '[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Clay*, 2005-Ohio-6, at ¶ 7, quoting *Eskridge* at 58-59.

{¶32} The State presented evidence that Mr. Kudla began sexually abusing B.M.K. when she was about 12 years old and had vaginal intercourse with her for the first time when she was about 14 years old. From that point forward, the abuse continued until she was 17 years old.

The State presented evidence that Mr. Kudla cultivated a close relationship with B.M.K. and gave her special privileges while, at the same time, he gave her numerous responsibilities and exercised strict control over her life. B.M.K.'s mother was largely absent from the home, and B.M.K. testified that she had a poor relationship with her younger sister. There was testimony that Mr. Kudla frequently punished B.M.K.'s younger sister and that his punishments, at times, became physical. B.M.K. testified that she witnessed her father throw her younger sister into a wall and push her into the stairs when she disobeyed him. Dr. Keck-McNulty testified that B.M.K. admitted that she was afraid of her father because she had seen what he had done to her younger sister. Likewise, B.M.K. testified that she continued to have sexual intercourse with her father because she "knew what would happen if [she] didn't." Although B.M.K. never said that her father held her down or threatened her, she testified that he continued to have sex with her over her protests that it "wasn't normal." She also testified that "[s]ometimes [the sexual conduct] was forced" because she "would tell him that [she] didn't want to do it."

{¶33} The jury heard extensive testimony about the psychological effects of grooming behavior. Dr. Keck-McNulty explained how sexual predators will cultivate a close relationship with a child and, once the child becomes dependent on that relationship, will slowly introduce sexual touching that eventually leads to intercourse. She testified that the victimization can go on for years because the victim fears losing the positive aspects of the relationship and because, meanwhile, the predator encourages secrecy and tells the victim that their special bond is one that society would not understand. B.M.K. testified that, when she questioned her relationship with her father, he would tell her that society "shouldn't be telling you what to do in your personal life." She further testified that she did not want to disclose the abuse because she loved her father and she did not want to see her family torn apart.

{¶34} Viewing the evidence in a light most favorable to the prosecution, we must conclude that a rational trier of fact could have found that the State proved the force element of rape beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. This case is distinguishable from *Schaim*, wherein the victim was 20 years old when her father raped her, she specifically testified that he did not force her to engage in sexual conduct, and there was no evidence that he "had used physical force or threatened [her] with physical force in the past, such that she would infer the threat of physical force based on past occurrences." *Schaim*, 65 Ohio St.3d at 55. B.M.K. was between the ages of 14 and 17 when her father raped her, so she was still a minor. She lived under his roof and by his rules and stated that she was afraid of him because she saw what he did to her younger sister when she disobeyed him. There was evidence that Mr. Kudla became physically violent with B.R.K. on multiple occasions, and that B.M.K. was present when those events occurred. *See Schaim* at paragraph one of the syllabus (threat of force may be inferred from circumstances surrounding sexual conduct). For years, Mr. Kudla instructed B.M.K. not to tell anyone about their sexual relationship. He held a position of authority over her the entire time that these events occurred such that he "was in a position to assert force by subtle and psychological means." *Clay*, 2005-Ohio-6, at ¶ 16. *See also Eskridge*, 38 Ohio St.3d at 58-59. "In such a case, we find nothing unreasonable about a finding that [B.M.K.'s] will was overcome." *Eskridge* at 59, quoting *Fowler*, 27 Ohio App.3d at 154. Thus, Mr. Kudla has not shown that his rape convictions are based on insufficient evidence. His third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

[MR. KUDLA'S] CONVICTIONS WERE AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE[.]

**{¶35}** In his fourth assignment of error, Mr. Kudla argues that his convictions are against the manifest weight of the evidence. Specifically, he argues that the jury lost its way when it determined that he had engaged in a sexual relationship with B.M.K. We disagree.

**{¶36}** When a defendant asserts that his conviction is against the manifest weight of the evidence:

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶37}** Mr. Kudla argues that the jury lost its way in convicting him because, apart from B.M.K.'s testimony, there was no direct evidence that he had a sexual relationship with her. He notes that B.M.K. denied their having a sexual relationship on multiple occasions. He also notes that, even after B.M.K. began claiming that the two had a sexual relationship, she asserted that it was consensual and that he had not done anything wrong. He argues that the evidence weighs in favor of the conclusion that he did not engage in sexual activity with B.M.K.

**{¶38}** Laila Menas testified that she began spending time with Mr. Kudla and his family because their daughters played soccer together. She testified that she dated Mr. Kudla from 2009 to mid-2012 and, during that time, was able to closely observe him interact with his children. She stated that Mr. Kudla and B.M.K. had a "very inseparable relationship" and that he was much closer to her than to the rest of his children. She indicated that he and B.R.K. had a poor relationship and that B.M.K. and B.R.K. did not get along. According to Ms. Menas, B.R.K. frequently stayed at her house and both Mr. Kudla and B.M.K. would ask her to keep B.R.K. because they did not like her.

{¶39} Ms. Menas testified that, near the beginning of her relationship with Mr. Kudla, he brought the children over to her house and appeared to be very upset. When she insisted that he tell her what was wrong, Mr. Kudla indicated that his estranged wife had accused him of molesting B.M.K. Mr. Kudla explained that his wife had found him sleeping in B.M.K.'s bedroom with the door locked. According to Ms. Menas, Mr. Kudla told her that he was sleeping in the room because he did not want his estranged wife attempting to have sex with him when she "would come home drunk from being out all night[.]"

{¶40} Ms. Menas testified that, near the end of her relationship with Mr. Kudla, he discovered that B.M.K. had been dating a boy. She testified that he became very emotional and described it as a betrayal. Ms. Menas described the discovery as the catalyst that ended her relationship with Mr. Kudla. She testified that Mr. Kudla asked to stop the relationship in order to focus on his children. According to Ms. Menas, Mr. Kudla told her that "if he wasn't distracted with our relationship [B.M.K.] would have never needed a boyfriend."

{¶41} B.R.K. testified that B.M.K. and her father had a close relationship with one another, but that she did not get along with either of them. She stated that B.M.K. and her father were "always alone together" and it "would seem like they were keeping secrets." After the family moved to Twinsburg, the time that they spent together increased. B.R.K. testified that the two frequently cuddled on the couch and would lie on top of one another under a blanket. She stated that they would stay up late at night and sometimes they would check to make sure everyone was asleep "before they went in his room * * * and you could hear the door lock." B.R.K. described her bedroom as being at an angle from her father's bedroom such that she could see his bedroom door from her bed. She testified that, on at least one occasion, she saw her sister carrying a purple dildo into their father's bedroom. She stated that loud music would

play after her sister and her father went into his bedroom, but that the music still did not stop her from hearing the springs in the bed. B.R.K. indicated that the noise was very upsetting and that she started wearing headphones to sleep. Other times, B.R.K. testified, she was so upset by the situation in her home that she left the house and walked outside to get some fresh air.

{¶42} B.R.K. testified that one of her nighttime ventures outside led to the police bringing her home. Mr. Kudla screamed at her as a result of that incident and removed the door to her room, telling her that she did not deserve privacy. B.R.K. testified that, approximately one week later, she missed the bus and was terrified to come home. She explained that her father sometimes physically injured her when he became angry and that he had started telling her that he was going to send her to a juvenile detention center because of her behavioral issues. She testified that, when she finally came home later, B.M.K. was there and told her that their father was out looking for her. B.R.K. decided to take a shower and was still in the bathroom when her father arrived back home. B.R.K. testified that Mr. Kudla broke through the bathroom door. She testified that he screamed at her and ended up slapping her across the face, leaving a bruise. Her father then left and did not come home for the remainder of the evening.

{¶43} B.R.K. testified that she left for school early the following day. She did not have her cell phone that day because her father had taken it away, but she testified that she received text messages from her sister because her sister sent them to one of B.R.K.'s friends. B.R.K. testified that her sister's messages indicated that she should be careful when she came home because her father was "still furious" with her. She stated that she grew more and more upset until she finally broke down at lunch. When school officials confronted her, she admitted that her father had hit her the night before. She also disclosed the fact that she believed her father was having a sexual relationship with B.M.K. B.R.K. testified that she never told anyone about

the things their father was doing before that day because she was afraid and he "always said that he was above the law and no matter what [she] said it wouldn't have mattered." She also stated that she did not think anyone would believe her because her father acted differently inside the house than he did when he was in public.

**{¶44}** Following B.R.K.'s disclosure, she was taken to the Twinsburg Police Department and other officers went to the Kudla home to retrieve her siblings. Detective Mark Kreiger testified that he interviewed B.M.K. at the station until his supervisor, Lieutenant Scarl, came into the room and took over the interview. During B.M.K.'s cross-examination, the defense played a portion of her recorded interview with the police. The recording depicts B.M.K. in an emotional state, repeatedly denying an inappropriate relationship with her father. In the recording, she eventually admits being in her father's room at night on occasion, but tells Detective Kreiger that the door was never locked and that she and her father were reviewing soccer tapes together. She continues to deny any abuse until Lieutenant Scarl enters the room and speaks with her. She then becomes extremely upset, pulling her shirt over her face and sobbing. After a short break, she admits that her father engages in sexual conduct with her, but casts their relationship as consensual. B.M.K. later testified that she said the acts were consensual because she thought that way her father would not get into trouble. She explained that she was trying to protect her father and keep her family from being torn apart.

**{¶45}** The same day that the police interviewed B.M.K. and B.R.K. they executed a search warrant at their Twinsburg residence. Detective Kreiger aided in the search and testified that the police found a vibrator and several dildos in B.M.K.'s drawer where B.R.K. had told them they would be hidden. The police also confiscated several computers from the home, including a laptop from B.M.K.'s room, a desktop computer from the living room, and a desktop

computer from Mr. Kudla's bedroom. Michael Dodson, a computer forensic specialist for the Bureau of Criminal Investigation ("BCI"), testified that he examined the computers after the police confiscated them. On the laptop taken from B.M.K.'s room, Dodson discovered pornographic video files. He testified that the laptop had several user profiles, one of which was "Dadio." He testified that all of the pornographic video files were located within the Dadio user profile.

{¶46} Dodson also testified regarding the analysis he performed on the computer taken from Mr. Kudla's bedroom. He testified that the computer only had one profile labeled "Gregory." He discovered that someone performed searches on that computer for "STD, STD Facts and Chlamydia." His analysis also disclosed that, on March 16, 2014 and March 22, 2014, someone visited a website that offered testing packages for sexually transmitted diseases. He testified that the computer stored the personal information that had been entered into the fields of a form on that website. There was evidence that the stored personal information matched Mr. Kudla's business phone number and his email address. There also was evidence that B.M.K. tested positive for chlamydia when she was tested at Akron Children's CARE Center in late May 2014.

{¶47} During his testimony, Mr. Kudla denied ever having chlamydia. He admitted that he had ordered testing kits before, but claimed that he did so for other men with whom he worked and for himself because he worried that his wife or some of the other women he had slept with might have infected him. The parties stipulated that Mr. Kudla tested negative for chlamydia on December 6, 2013, March 28, 2014, and July 23, 2014. They also stipulated, however, that Mr. Kudla waited more than seven weeks after the court ordered him to submit to testing before having the July 23rd test performed.

{¶48} This Court outlined much of Dr. Keck-McNulty's testimony above. Dr. Keck-McNulty explained the grooming process and testified that she began seeing B.M.K. and B.R.K. as patients following their disclosure of Mr. Kudla's abuse. She testified that when child sexual abuse occurs in a family with siblings, the victim will typically receive special treatment and special time with the parent. She testified that the other siblings will typically feel resentful of the fact that they appear to get into trouble more often and that the entire situation "creates a big divide between siblings and the family."

{¶49} Dr. Keck-McNulty testified that B.M.K. initially did not want to meet with her. She testified that B.M.K. was torn between loving her father and accepting that he had manipulated and abused her. She stated that B.M.K. was worried to confront her father in court because "she was afraid she was going to freeze up and not be able to tell her story * * *." When Dr. Keck-McNulty asked B.M.K. what she would like to see happen to her father, B.M.K. responded that she "just want[ed] him gone[.]" Dr. Keck-McNulty testified that B.M.K. relayed having difficulty eating and sleeping. She told Dr. Keck-McNulty that she would have nightmares about "what [her father] did and about him yelling." Dr. Keck-McNulty testified that when B.M.K. tried to describe one of the dreams, she started to cry and was unable to continue. Dr. Keck-McNulty testified that her observations of B.M.K., in conjunction with the information she received from B.R.K. and B.M.K.'s CARE Center interview and exam, were consistent with sexual abuse.

{¶50} Jennifer Kudla, B.M.K.'s mother, testified that she stopped living with her family in 2010 because she and Mr. Kudla argued constantly and they decided it would be better for the family if they lived apart. She testified that Mr. Kudla scared her because he would become angry very quickly and had an explosive temper. She stated that they began sleeping apart the

year before she moved out. On one occasion, she went to wake B.M.K. for school and discovered that Mr. Kudla was inside her small bedroom with the door locked. According to Ms. Kudla, when she asked Mr. Kudla why he was in there with the door locked, he claimed that he had locked himself inside and slept there because he was afraid she was going to kill him in his sleep. She testified that the incident made her wonder whether her husband was abusing B.M.K. because he was always so affectionate toward her.

{¶51} Plagued by her concerns, Ms. Kudla discussed the matter with someone in Mr. Kudla's family. She testified that her husband eventually learned about that conversation and, when he found out, he "came after [her] and * * * broke down [her] bedroom door off of the hinges and scared the crap out of [her]." She testified that Mr. Kudla also threatened to take the children away from her. Ms. Kudla admitted that she suffered from mental health issues and testified that Mr. Kudla would use that against her, telling her that she was imagining things. She testified that she confronted B.M.K. once in 2013 to ask if her father was sexually abusing her because B.R.K. had suggested that might be the case. When B.M.K. denied the accusation, however, Ms. Kudla did not pursue it further by filing a formal police report. She testified that she was afraid to file a report because she did not have hard evidence against Mr. Kudla and did not want to lose her children.

{¶52} Mr. Kudla testified in his own defense and presented the testimony of Kelley Lube, a family friend, and Robert Kudla, his father. Ms. Lube testified that she had a significant amount of interaction with Mr. Kudla and his children. According to Ms. Lube, Mr. Kudla treated all of his children the same and was a relatively lax father. She testified that she never had any concerns about inappropriate behavior and that neither B.M.K., nor B.R.K. ever suggested that their father was abusing them in any manner. Meanwhile, Mr. Kudla's father

testified that he had a good relationship with his grandchildren and that they were usually well-behaved. He also testified, however, that B.M.K. and B.R.K. suffered from sibling rivalry and that B.R.K. always upset the balance of the family because she was the jealous type and wanted the attention.

{¶53} Mr. Kudla testified that he never touched B.M.K. in an inappropriate manner and never had sexual intercourse with her. He testified that he and his estranged wife had relationship issues and that, in 2009, he discovered she was having an affair. He then reduced his work hours and went to counseling with her, but ultimately started sleeping in a different room because things became so contentious. Mr. Kudla stated that he had difficulty sleeping and set up booby traps because he was so concerned about his wife "offing [him] so she could take the kids." According to Mr. Kudla, he slept in B.M.K.'s room once, at her suggestion, because he desperately needed sleep and the door had a lock on it.

{¶54} Mr. Kudla testified that he would punish B.M.K. when she misbehaved, but that it was rare for her to have disciplinary issues. Conversely, he stated that her sister, B.R.K., had "always been a handful" and described her as selfish and self-centered, like her mother. He stated that he never intended to send B.R.K. to a juvenile detention center, but had researched a diversion program for her due to her falling grades and behavioral issues. Mr. Kudla admitted that he slapped B.R.K. in the face the night before his arrest, but testified that he did so because he heard her say something to the effect of "[y]ou can go f*** yourself" while he was yelling at her. He also admitted that he kicked down the bathroom door to get to B.R.K. According to Mr. Kudla, he did so because B.R.K. did not answer when he pounded on the door and, given that she had been acting depressed, he was worried that she might be harming herself.

{¶55} Mr. Kudla admitted that he had a bad temper was he was younger, but claimed that he no longer did. He denied that he had ever physically harmed B.R.K. before the day that he slapped her. According to Mr. Kudla, he tried to have a close relationship with all of his kids and "tried to be all equal but [B.R.K.] didn't want to participate in it." He denied that he gave B.M.K. special treatment. Nevertheless, he admitted that he took B.M.K. kayaking during the school day, the day after he slapped B.R.K. and the same day that B.R.K. decided to disclose his abuse. Mr. Kudla testified that B.M.K. asked to go kayaking that day, and he and his estranged wife mutually agreed that she could miss school because the water conditions were ideal. Mr. Kudla also admitted to exchanging text messages about B.R.K. with B.M.K. when she and her sister went to Florida with their grandparents. In one of his messages, he told B.M.K. that he "was kind of hoping [B.R.K.] wouldn't make it back." In another message, B.M.K. teased that everyone loved Mr. Kudla, with the exception of B.R.K., and he responded "F*** [B.R.K.], lol." Mr. Kudla testified that the messages were simply meant as jokes.

{¶56} Having carefully reviewed the record, we cannot conclude that the jury lost its way when it convicted Mr. Kudla. Although Mr. Kudla testified that he did not have a sexual relationship with his daughter, B.M.K. testified that he sexually abused her for a period of at least six years. She explained that she initially denied the abuse and then called it consensual because she did not want her father to get into trouble and did not want her family torn apart. The jury heard testimony about the grooming process, and Dr. Keck-McNulty explained how victims of grooming have difficulty disclosing the abuse, in part, because they are hesitant to lose the positive aspects of the relationship that they have with their abuser. Numerous witnesses testified that Mr. Kudla favored B.M.K. and that he had a much closer relationship with her than he had with the rest of his children. The jury also heard testimony from B.R.K., who stated that

her father and B.M.K. would go into his bedroom at night, lock the door, and play loud music before the bed springs started squeaking. B.R.K. testified that she saw B.M.K. carry a dildo into her father's room on one occasion, and the police uncovered several sexual devices in B.M.K.'s drawer. Further, there was evidence that B.M.K. tested positive for chlamydia, and that, before the abuse here came to light, Mr. Kudla had ordered testing kits for sexually transmitted diseases.

{¶57} While Mr. Kudla claimed that he did not have a sexual relationship with his daughter, "the jury could have reasonably disbelieved his testimony." *State v. Jackson*, 9th Dist. Summit No. 27479, 2015-Ohio-5096, ¶ 29. "It is well-settled that the [jury] is 'free to believe all, part, or none of the testimony of each witness.'" *State v. Johnson*, 9th Dist. Summit No. 26914, 2014-Ohio-2856, ¶ 40, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. "This Court will not overturn a verdict on a manifest weight challenge simply because the jury chose to believe the State's witnesses rather than [Mr. Kudla]." *State v. Klein*, 9th Dist. Summit No. 26573, 2013-Ohio-3514, ¶ 12. We have reviewed the record and must conclude that this is not the exceptional case where the jury lost its way in convicting Mr. Kudla. *See Otten*, 33 Ohio App.3d at 340. Consequently, Mr. Kudla's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR II

[MR. KUDLA] WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL BY THE FAILURE TO OBJECT TO THE COURT'S ERRONEOUS JURY INSTRUCTION AND IN THE [CUMULATIVE] ERRORS COMMITTED THROUGHOUT THE TRIAL[.]

{¶58} In his second assignment of error, Mr. Kudla argues that he received ineffective assistance of counsel. Specifically, he argues that he was prejudiced when his attorneys failed to object when the court instructed the jury on the force element of rape and when the State introduced hearsay statements through Dr. Keck-McNulty. He further argues that he was

prejudiced when his attorneys played the recording of B.M.K.'s interview at the Twinsburg Police Department.

**{¶59}** This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland* at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. This Court need not address both prongs of *Strickland* where an appellant fails to prove either prong. *See State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

**{¶60}** First, Mr. Kudla argues that his attorneys were ineffective because they failed to object when the trial court instructed the jury on the force element of rape. Mr. Kudla challenged the court's force instruction in his first assignment of error. In overruling that assignment of error, we determined that the trial court did not err when it instructed the jury on force. *See* discussion, *supra*. Because the court did not err in its force instruction, Mr. Kudla was not prejudiced by the lack of an objection to the instruction. As such, we reject his argument that he received ineffective assistance of counsel on the foregoing ground.

**{¶61}** Second, Mr. Kudla argues that his attorneys were ineffective because they did not object when Dr. Keck-McNulty testified about statements that B.R.K. made during their therapy

sessions. Dr. Keck-McNulty testified that B.R.K. told her she had to wear headphones at night to drown out the "sounds of sex" coming from her father's bedroom. She also testified that B.R.K. told her that B.M.K. and her father would go to bed after she and her younger brothers went to bed and then she "could hear them having sex." Even assuming that it was error for Dr. Keck-McNulty to relay B.R.K.'s statements, B.R.K. also testified at trial. She testified that she began wearing headphones at night because she could hear the bed springs in her father's bedroom after B.M.K. and her father went inside. She further testified that the two would stay up late and then check that B.R.K. and her brothers were asleep before going into his bedroom, locking the door, and playing loud music. Mr. Kudla has not explained how he was prejudiced by Dr. Keck-McNulty's testimony, given that B.R.K. testified to the same events at trial. *See* App.R. 16(A)(7). Because Mr. Kudla has failed to demonstrate prejudice, we reject his argument that his attorneys were ineffective for failing to object to Dr. Keck-McNulty's testimony. *Strickland*, 466 U.S. at 694.

**{¶62}** Finally, Mr. Kudla argues that his attorneys were ineffective because they played the recording of B.M.K.'s interview with the police for the jury. He argues that the statements on the recording amounted to hearsay, so, had his own counsel not played the recording, the State would not have been able to do so. He argues that there was no tactical purpose behind the decision to play the recording and that it "served only to support the veracity of [B.M.K.'s] trial testimony."

**{¶63}** Defense counsel's strategy at trial was to discredit B.M.K. by suggesting that she lied about a sexual relationship with her father in order to protect B.R.K. Defense counsel argued that B.R.K. fabricated the accusations in order to save herself from further punishment and, forced to choose between her father and her emotionally distraught sister, B.M.K. decided

to adopt the lie. The attorney who delivered the closing argument for Mr. Kudla argued that the recording of B.M.K.'s police interview was evidence that the police gave her a "blueprint for fabrication" by explaining the grooming process to her in an attempt to draw her into disclosing the abuse. He also argued that the recording showed that B.M.K. was lying, as she repeatedly denied the abuse and then slowly claimed that it happened, but was unable to recall many of the details surrounding the abuse. Defense counsel argued that B.M.K. would not have forgotten details if she was an abuse victim because, for sexual abuse victims, those details "would be burned in your mind for the rest of your life."

{¶64} "Counsel's strategic or tactical decisions will not form the basis of an ineffective assistance of counsel claim." *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 42. Here, Mr. Kudla's defense attorneys played the police interview recording as part of their strategy to discredit B.M.K. Indeed, Mr. Kudla has relied on the same recording on appeal as evidence that B.M.K. only admitted to a sexual relationship with her father "after the intensity of an extensive interrogation[.]" Because Mr. Kudla's attorneys introduced the recording as part of their trial strategy, we cannot conclude that their decision to do so amounted to ineffective assistance of counsel. *See State v. Gary*, 9th Dist. Wayne No. 12CA0014, 2012-Ohio-5813, ¶ 38-39. As such, Mr. Kudla's second assignment of error is overruled.

## III.

{¶65} Mr. Kudla's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
SCHAFER, J.
CONCUR.


APPEARANCES:

JEFFREY N. JAMES and WALTER J. BENSON, Attorneys at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.