[Cite as *State v. Staples*, 2022-Ohio-3472.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

    v.

LEE STAPLES

    Appellant

C.A. No.     21CA0050-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    20CR0077

DECISION AND JOURNAL ENTRY

Dated: September 30, 2022

TEODOSIO, Presiding Judge.

{¶1}  Defendant-Appellant, Lee Staples, appeals from the judgment of the Medina County Court of Common Pleas.  This Court affirms.

I.

{¶2}  E.S. met Mr. Staples in February 2019 when she was thirteen years old and he was in his late twenties.  The two lived in the same condominium complex, and Mr. Staples worked as the night clerk at their local Circle K gas station.  E.S. would talk to Mr. Staples when she went to the gas station, and they soon developed a rapport.  E.S. turned fourteen about two months after they first met and, at some point, she and Mr. Staples connected with one another on social media.  The two then began exchanging messages through a social media-based messaging app.

{¶3}  E.S. began taking small trips around the neighborhood with Mr. Staples and, on several of those trips, they smoked marijuana together.  Although E.S.' mother was aware that her daughter and Mr. Staples had become friends, she was not initially aware of the extent of their

relationship or any illicit behavior in which they engaged. Several times over the course of E.S.' relationship with Mr. Staples, E.S. snuck out of her home in the middle of the night because he asked her to come visit him while he was working.

{¶4} One day in May 2019, E.S. accompanied Mr. Staples to Chipotle with her mother's permission so that they could pick up food for themselves and her mother. Mr. Staples stopped at a friend's unoccupied house on the return trip, and E.S. accompanied him inside. E.S. described how, once they went inside, Mr. Staples supplied her with marijuana, cigarettes, and alcohol and forced her to engage in sexual conduct with him. After the incident, Mr. Staples brought E.S. home, and she kept silent about what had transpired.

{¶5} E.S. stopped communicating with Mr. Staples for a time after the foregoing incident but started visiting him again at the gas station as the summer wore on. In August, the police found E.S. at the gas station with Mr. Staples past curfew on two separate dates. The second occasion led to E.S. being transported to the police station and put in foster care for two days because the Ohio Department of Job and Family Services ("ODJFS") was unable to locate her mother. When E.S. came home, her mother began questioning her about the nature of her relationship with Mr. Staples. E.S. initially denied any wrongdoing but, two months later, she admitted that Mr. Staples had engaged in sexual conduct with her.

{¶6} Mr. Staples was originally indicted on one count of having unlawful sexual conduct with a minor in violation of R.C. 2907.04(A). Because the State neglected to seek an elevated charge based on the age difference between Mr. Staples and E.S. when it initially pursued its charge against him, it later resubmitted the case to the grand jury. Mr. Staples was then indicted on one count of having unlawful sexual conduct with a minor in violation of R.C. 2907.04(A)/(B)(3). The State dismissed the original charge before trial, and the matter was

submitted to a jury.  The jury found Mr. Staples guilty, and he was sentenced to eighteen months in prison and classified as a tier II sexual offender.

{¶7}	Mr. Staples now appeals from his conviction and raises two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN ENTERING A CONVICTION THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶8}	In his first assignment of error, Mr. Staples argues that his conviction is against the manifest weight of the evidence.  We disagree.

{¶9}	A challenge to the manifest weight of the evidence concerns the State's burden of persuasion. *State v. Klafczynski*, 9th Dist. Medina No. 18CA0084-M, 2020-Ohio-3221, ¶ 7.  This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5.  This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  *See also Otten* at 340.

{¶10} Mr. Staples was convicted of having unlawful sexual conduct with a minor in violation of R.C. 2907.04(A)/(B)(3). His conviction required the State to prove that, while Mr. Staples was at least eighteen years old, he engaged in sexual conduct with E.S. when he either knew she was between the age of thirteen and sixteen or was reckless in that regard. R.C. 2907.04(A). The State also had to prove that, at the time of his offense, Mr. Staples was "ten or more years older" than E.S. R.C. 2907.04(B)(3).

{¶11} Mr. Staples has not challenged the sufficiency of the State's evidence. Instead, he argues that his conviction is against the manifest weight of the evidence because E.S. was not a credible witness. He notes that there was no direct or forensic evidence to support her account. He also notes that she claimed to have consumed an unrealistic amount of alcohol before the alleged sexual conduct occurred. Regarding the timing of her disclosure, Mr. Staples notes that E.S. did not exhibit any signs of distress or accuse him of misconduct until after she was forced to spend two days in foster care. Mr. Staples argues that the weight of the evidence does not support his conviction, so the jury lost its way by convicting him.

{¶12} Officers Brad Hughes and Derek Zelenka testified that they were partnered on third shift during the month of August 2019. While out on patrol on August 4th, they responded to a Circle K gas station where a young female had been spotted. Officer Zelenka believed it was after 1:00 a.m. when they arrived at the gas station and found E.S. there. Officer Zelenka was familiar with E.S. because he was the school resource officer at her school. When the officers spoke with E.S., they learned that she had come to the gas station that evening to see Mr. Staples, who was the night clerk. The officers then spoke with Mr. Staples, stressed that E.S. was a minor, and cautioned him against allowing her to be in the store after curfew. After speaking with Mr. Staples, the officers drove E.S. home and issued a citation for her curfew violation.

{¶13} While on patrol two weeks later, Officers Hughes and Zelenka spotted a female who looked like E.S. entering the same Circle K. The officers decided to investigate and drove over to the gas station. By the time they entered, there was no female in sight, but Mr. Staples greeted them. Officer Zelenka immediately asked Mr. Staples, "Where is she?", and Mr. Staples directed the officers to the employee-only area of the store. The officers found E.S. hiding from them in the employee bathroom. After speaking with her and Mr. Staples, the officers brought them back to the police station and contacted ODJFS. There was evidence that, following the incident, E.S. spent two days in foster care before being reunited with her mother.

{¶14} E.S.' mother testified that she was familiar with Mr. Staples because she would speak to him when she frequented the Circle K. Sometime in May 2019, she learned that her daughter had befriended Mr. Staples. Although she was aware of the age difference between them, she believed Mr. Staples was just being friendly and allowed him to pick up E.S. from home on a few occasions so that they could spend time together or go out for food. She recalled one occasion in May where E.S. and Mr. Staples went to pick up Chipotle for everyone and took an unusually long time to return. The mother did not notice anything amiss when they arrived back home, however, so she dismissed the delay.

{¶15} The mother testified that she knew she would be away from home the night of August 17th into the morning of August 18th, so E.S. was meant to spend that night at a friend's house. When the mother woke up in the morning, however, she found she had a message from ODJFS. She learned that the police had found E.S. with Mr. Staples at the Circle K past curfew and that E.S. had been temporarily placed in foster care. When she brought E.S. home, the mother began questioning E.S. about the nature of her relationship with Mr. Staples. E.S. dismissed her mother's concerns, but the mother noticed a change in E.S.' behavior from that point forward.

Specifically, she noticed that E.S. became "very depressed" and "[c]losed off * * *." The mother testified that she tried to contact Mr. Staples after the incident but was unsuccessful. Although she tried to contact him via the same messaging app E.S. had used to contact him, she testified that Mr. Staples blocked her on the app. She also was unable to find him at the Circle K or any nearby bars that she knew he frequented.

{¶16} E.S. testified that she first met Mr. Staples in February 2019, two months before she turned fourteen years old. Although they lived in the same condominium complex, E.S. became familiar with Mr. Staples through his work as a night clerk at Circle K. She testified that they began talking in person before connecting with one another on social media and, eventually, chatting on a messaging app. E.S. acknowledged that they would exchange messages in the middle of the night and that Mr. Staples would ask her to come to the gas station while he was working. She further acknowledged that she snuck out of her home multiple times to meet him at the gas station.

{¶17} E.S. testified that, after a few months, Mr. Staples began picking her up at home and taking her places. She confirmed that her mother was not always home when Mr. Staples picked her up. On her trips with Mr. Staples, E.S. testified, they would go to an area and park or take a walk. E.S. stated that she and Mr. Staples smoked marijuana together on four of those occasions.

{¶18} In May 2019, Mr. Staples picked up E.S. from home so that they could purchase food for themselves and her mother at Chipotle. E.S. testified that they got the food but, rather than take her home, Mr. Staples drove her to his friend's house. Mr. Staples told E.S. that he had to go inside the house to get something, so she followed him inside. E.S. did not believe anyone was home at the time and, once they were inside, Mr. Staples gave her marijuana to smoke. He

then poured her a drink from a bottle of vodka that was sitting out on the counter. E.S. drank the alcohol Mr. Staples provided her and smoked cigarettes he gave her. She testified that she was feeling "[p]retty intoxicated" by the time Mr. Staples led her to an upstairs bedroom.

{¶19} E.S. described how Mr. Staples removed his clothing and instructed her to do the same. When she declined, he said that "[she] owed him" and removed her clothes himself. She explained how Mr. Staples pinned her down on the bed and engaged in vaginal intercourse with her before stopping, forcing her to perform fellatio, and ejaculating into her mouth. After the incident, Mr. Staples drove E.S. home and accompanied her into her condominium so that they could eat the food they had purchased from Chipotle. E.S. confirmed that her mother never asked her any questions when she returned home. Instead, her mother began drinking with Mr. Staples.

{¶20} E.S. testified that she stopped speaking with Mr. Staples for a while after the incident because she found it uncomfortable and, at some point, she started dating a boy. She began visiting Mr. Staples at the gas station again later that summer, however, and eventually was discovered there with him past curfew. E.S. testified that her mom started questioning her about her curfew violations and her relationship with Mr. Staples following the two days she spent in foster care. She indicated that she initially lied to her mother about the nature of her relationship with Mr. Staples because she did not want to hurt her mother's feelings. By October, however, she decided to write a letter to her mother to tell her about the incident that had occurred. E.S. testified that she wrote her mother a letter rather than tell her in person because she did not want to see her mother cry.

{¶21} E.S.' mother confirmed that, in October 2019, E.S. approached her before school and handed her a letter. E.S. instructed her mother not to read the letter until she was at school. The mother broke down crying when she read the letter and spoke with E.S. when she returned

from school. After she spoke with E.S., the mother called the police to report that Mr. Staples had engaged in sexual conduct with her daughter.

{¶22} E.S. was interviewed several times in the wake of her disclosure, both by the police and at the child advocacy center. At trial, E.S. admitted that she had not been entirely consistent when describing the incident during which Mr. Staples had sexual intercourse with her. Specifically, she sometimes had claimed the act was forced and sometimes had claimed it was not forced. There is no indication in the record, however, that E.S. ever wavered as to whether the sexual conduct actually occurred.

{¶23} In challenging the State's version of the events, Mr. Staples draws much attention to the fact that E.S. testified to drinking "a mug full of vodka" before the alleged sexual conduct occurred. Mr. Staples argues that her testimony strains credulity because a mug "can customarily contain eight to ten ounces of liquid" and the effect of that volume of alcohol on a fourteen-year-old girl would have been significant. He notes that E.S. never claimed to have any difficulty walking and that her mother failed to notice anything odd about her when she returned home. Further, he notes that E.S.' behavior remained unremarkable for several months after the alleged incident. The mother only noticed E.S. beginning to act differently after she spent two nights in foster care. According to Mr. Staples, the jury lost its way when it chose to believe the State's version of the events.

{¶24} The record reflects that E.S.' testimony regarding the exact amount of alcohol she ingested before Mr. Staples engaged in sexual misconduct with her is unclear at best. She initially testified that she drank "a mug full of vodka." On cross-examination, however, she testified that Mr. Staples poured her "some vodka" in a mug and that she drank "[t]he whole mug." Her overall testimony could be taken to mean that she drank a full mug of vodka or that she was handed a mug

containing only vodka and, however much vodka was inside it, she drank it all. She was never asked to estimate how much vodka was in the mug. Thus, there is no support in the record for Mr. Staples' argument that E.S. claimed she consumed upwards of eight to ten ounces of vodka.

{¶25} Having reviewed the record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found Mr. Staples guilty of having unlawful sexual conduct with E.S. *See Otten*, 33 Ohio App.3d at 340. The jury heard testimony that Mr. Staples was more than twice E.S.' age when the two began conversing, exchanging messages on social media, and meeting in the middle of the night. E.S. described how Mr. Staples befriended her, encouraged her to sneak out to meet him, provided her with marijuana, and eventually had sex with her. While she vacillated on the issue of whether the sexual conduct was forced, the State was not required to prove force to secure a conviction. The State only had to prove that Mr. Staples engaged in sexual conduct with E.S. when he knew she was between thirteen and sixteen years old or was reckless in that regard. *See* R.C. 2907.04(A)/(B)(3).

{¶26} The jury heard E.S.' mother testify how she began questioning the relationship between E.S. and Mr. Staples once she learned about E.S.' curfew violations and ODJFS became involved. The jury also heard testimony that E.S. and her mother lost contact with Mr. Staples at that time, that E.S. became noticeably depressed and withdrawn, and that E.S. eventually confessed the truth of what had happened to her mother in a letter. This Court has recognized that "[i]t is not uncommon * * * for victims of abuse to delay their reporting." *State v. Berila*, 9th Dist. Medina No. 19CA0007-M, 2020-Ohio-3523, ¶ 24. The jury was in the best position to assess the credibility of the testifying witnesses and decide whether E.S. was telling the truth. *See State v. Brown*, 9th Dist. Lorain No. 20CA011618, 2021-Ohio-2540, ¶ 48. The jury's verdict is not against the manifest weight of the evidence simply because the jury chose to believe E.S. *See State v.*

*Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.  Upon review, Mr. Staples has not shown that this is the exceptional case where the jury lost its way by convicting him.  *See Otten* at 340.  As such, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FAILING TO PROVIDE A WRITTEN COPY
OF THE INSTRUCTIONS TO THE JURY.

**{¶27}**  In his second assignment of error, Mr. Staples argues that the trial court committed plain error when it failed to provide the jury with a written copy of the jury instructions.  For the following reasons, this Court rejects his argument.

**{¶28}**  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  Crim.R. 52(B).  "To establish plain error, one must show (1) an error occurred, i.e., a deviation from a legal rule, (2) the error is plain, i.e., an obvious defect in the proceedings, and (3) the error affected a substantial right, i.e., affected the outcome of the proceedings."  *State v. Grant*, 9th Dist. Summit No. 29259, 2019-Ohio-3561, ¶ 5, citing *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 36.  Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶29}**  Crim.R. 30(A) requires trial courts to reduce final jury instructions "to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record."  *See also State v. Mayle*, 7th Dist. Belmont No. 14 BE 39, 2015-Ohio-4838, ¶ 13-18.  Mr. Staples argues that the trial court failed to comply with Crim.R. 30(A) because it did not provide the jury with a copy of its jury instructions.  He points to a statement the trial

court made to the jury at the close of its instructions. In that statement, the trial court informed the jury:

> It may be difficult to remember all of the instructions that I have given you. If during your deliberations you cannot remember or are in doubt about a portion of the instructions, you may request such information. The foreperson must put your question in writing, indicating specifically what is requested.

According to Mr. Staples, the foregoing statement shows that the trial court did not supply the jury with a copy of the instructions. Mr. Staples argues that he was prejudiced by the court's failure to do so because legal instructions are complex and "jurors tend to forget the instructions."

**{¶30}** Upon review, this Court cannot conclude that Mr. Staples has demonstrated the existence of an error in support of his claim of plain error. See *Grant* at ¶ 5, citing *Morgan* at ¶ 36. He has not pointed this Court to any evidence that the trial court failed to supply the jury with a copy of its jury instructions. The trial court's statement to the jury, inviting them to submit questions they might have about the instructions, is ambiguous in that regard, and Mr. Staples' argument as to his interpretation of that statement is not evidence. At the beginning of the trial, the trial court specifically informed the jury:

> I will give you the written instructions of law. We will go over them together. You will have them in writing to take back in the jury room with you and then the case will be submitted to you for your determination.

There is no nothing in the record to show that the trial court did not, in fact, provide the jury with a copy of its written instructions. Thus, Mr. Staples has not established his claim of plain error. *See State v. Kudla*, 9th Dist. Summit No. 27652, 2016-Ohio-5215, ¶ 17 ("[A]n appellant who seeks to demonstrate plain error must, first and foremost, demonstrate that an error occurred."). His second assignment of error is overruled.

III.

**{¶31}** Mr. Staples' assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, J.
HENSAL, J.
CONCUR.

APPEARANCES:

RUSSELL S. BENSING, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.